UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
ABRAHAM MIRMAN,

          Plaintiff,

    -against-

ROBERT FEINER,

          Defendant.
------------------------------X

APPEARANCES:

Attorneys for Plaintiff:
    Pearl Cohen Zedek Latzer LLP
    1500 Broadway, 12th Floor
    New York, New York
      By: Mitchell C. Shelowitz, Esq.
          Darya Dominova, Esq.

Attorneys for Defendant:
    Furman Kornfeld & Brennan LLP
    61 Broadway, 26th Floor
    New York, New York 10006
      By: Andrew R. Jones, Esq.
          Izabell Lemkhen, Esq.

MEMORANDUM & ORDER
10 CV 5330 (DRH)(WDW)

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★  SEP 2 8 2012  ★

LONG ISLAND OFFICE

HURLEY, Senior District Judge

      Plaintiff brings this diversity action[1] alleging breach of contract, breach of fiduciary duty, and promissory estoppel. Before the Court is defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(3), and 12(b)(6). For the reasons stated below, defendant's motion under Fed. R. Civ. P. 12(b)(2) is granted and this action is dismissed without prejudice for lack of personal jurisdiction.

---

[1] The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. Mirman is a resident of New York, Feiner is a resident of Connecticut, and the complaint alleges an amount in controversy in excess of $75,000.

I.    Applicable Standards - Motion to Dismiss Pursuant
      to Fed. R. Civ. P. 12(b)(2)

On a motion to dismiss under Rule 12(b)(2), the
plaintiff bears the burden of establishing jurisdiction over the
defendant. See Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84
F.3d 560, 566 (2d Cir. 1996). Here, the current motion was made
pre-discovery and absent an evidentiary hearing. Under such
circumstances, plaintiff may defeat defendant's Rule 12(b)(2)
motion "by making a prima facie showing of jurisdiction by way of
the complaint's allegation, affidavits, and other supporting
evidence." Mortg. Funding Corp. v. Boyer Lake Pointe, L.C., 379
F. Supp. 2d 282, 285 (E.D.N.Y. 2005). Moreover, given the early
stage of proceedings here, the Court must view the pleadings in
the light most favorable to the plaintiff, see Sills v. The
Ronald Reagan Presidential Found., Inc., 2009 U.S. Dist. LEXIS
44774, *13 (S.D.N.Y. May 27, 2009)(pre-discovery motion to
dismiss), and when evidence is presented, "doubts are resolved in
plaintiff's favor, notwithstanding a controverting presentation
by the moving party," A.I. Trade Fin., Inc., v. Petra Bank, 989
F.2d 76, 79-80 (2d Cir. 1993)(considering evidence presented by
affidavit without evidentiary hearing); accord Bohn v. Bartels,
620 F. Supp. 2d 418, 424 (S.D.N.Y. 2007)(same). However, the
Court is not bound by conclusory statements, without supporting
facts. Jazini v. Nissan Motor Co, Ltd., 148 F.3d 181, 185 (2d
Cir. 1998); see also Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)

-2-

(courts considering a motion to dismiss should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth[;] [w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

## II. BACKGROUND FACTS

The following facts are undisputed unless otherwise noted and are taken from plaintiff's complaint, as well as the affidavits and documents submitted by the parties with respect to defendant's Rule 12(b)(2) motion.

### a. The Escrow Agreement Based Upon a Prior Dispute and Settlement

The instant action is based on an escrow agreement reached between the parties via email in May 2007. (See Aff. of Andrew R. Jones, dated Mar. 7, 2011 ("Jones Aff.").) By way of background, the escrow agreement came about as the result of a dispute between the plaintiff, Abraham Mirman ("plaintiff" or "Mirman"), and clients of the present defendant, Robert Feiner ("defendant" or "Feiner"), regarding the payment of finder's fees and commissions allegedly due by Mirman. Mirman settled that matter without the need for litigation by agreeing to pay Feiner's clients, John Comeau ("Comeau") and Magdy Gayed ("Gayed"),[2] 100,000 shares of stock in the Charys Holding

---

[2]Comeau is a resident of Connecticut, and Gayed is a resident of New Jersey.

-3-

Company, Inc. ("Charys") in exchange for a general release from both individuals.[3]  (Complaint ("Compl.") ¶¶ 7, 8.)  Feiner, as counsel to Comeau and Gayed, negotiated the terms of the agreement with Mirman, and "assumed the role of escrow agent[4] in order to facilitate the closing of the settlement."[5]  (Id. ¶¶ 10, 12.)

In or around July 2, 2007, Mirman delivered to Feiner an executed general release, as well as 100,000 shares of Charys stock to place in escrow pending receipt of the general release from Feiner's clients.[6]  (Id. ¶¶ 13 & 14.)  Comeau and Gayed

---

[3]In his motion to dismiss and in an affidavit attached thereto, Feiner states that the settlement agreement contemplated the transfer of 100,000 Charys shares through Mirman's own companies, and an additional transfer of 300,000 shares directly from the Charys. (Def.'s Mem. at 5; Aff. of Robert Feiner, filed Mar. 11, 2011 ("Feiner Aff.") ¶ 8.)  Defendant does not dispute that the 100,000 shares were transferred to escrow, but contends that the remaining 300,000 shares were not. (Feiner Aff. ¶¶ 13-14.)

[4] Defendant proffers that he did "not enter into an escrow agreement with Plaintiff on behalf of Comeau and Gayed [but rather simply] served a limited ministerial role by safekeeping documents to ensure that the consideration for the underlying settlement was not released until all of the terms of the agreement were fully satisfied." (Def.'s Mem. at 3-4.)  In the Court's view, the May 2007 arrangement between the parties clearly constitutes an escrow agreement notwithstanding defendant's protestations to the contrary.  See Black's Law Dictionary 624 (9th ed. 2009)(defining "escrow" and "escrow agreement").

[5] Mirman chose to represent himself without the benefit of counsel throughout these negotiations. (Compl. ¶ 11.)

[6]On that date, the stock was trading at $1.78 per share, placing the total value of the transferred shares at $178,000.

-4-

allegedly provided Feiner with a copy of their releases to hold in escrow, but Feiner never delivered the releases to any party. (Id. ¶¶ 15 & 16.) From this "silence," Mirman "assumed that the Settlement had been consummated." (Id. ¶ 16.)

Months later, in February of 2008, Charys filed for bankruptcy, allegedly rendering the transferred shares in the company "worthless." (Id. ¶ 18.) Later that year, Comeau, Gayed, and "their third partner" filed a lawsuit in Florida against Mirman alleging the same conduct at issue in the prior dispute. (Id. ¶ 19.) On September 9, 2010, Mirman sent a letter to Feiner demanding that he pay Mirman the full value of the Charys shares at the time they were transferred to escrow, viz., $178,000, or deliver executed general releases from Comeau and Gayed. (Id. ¶ 20.) Feiner refused. Feiner's law firm confirmed with Mirman that the shares are still being held in escrow. (Id. ¶ 21.) As a result, Mirman brings the instant state law claims for breach of fiduciary duty, breach of contract, and promissory estoppel.

b.    The Parties' Contentions

In support of their respective positions regarding personal jurisdiction, the two parties characterize Feiner's involvement in the events at issue very differently. Mirman alleges that Feiner "assumed the role of [his] escrow agent," thereby accepting a fiduciary duty to Mirman. (Id. ¶ 12.) He

---

(Compl. ¶ 14.)

argues that Feiner "unequivocally indicated that [he] was acting as a trustee of both [] Mirman and [Feiner's] former clients." (Pl.'s Opp'n at 3.) Mirman further alleges that he and Feiner entered into a contractual arrangement wherein Feiner agreed to act as Mirman's escrow agent in exchange for the opportunity to "assist his clients in obtaining a speedy settlement of [their] claims." (Pl.'s Opp'n at 17; see also Compl. ¶¶ 31-33.) To perform these services, Feiner, working from Connecticut, allegedly "conducted numerous one-on-one telephone discussions . . . [and] exchanged numerous email correspondence" with Mirman in New York. (Compl. ¶ 10.) Mirman also notes that he executed the release in New York, delivered the subject shares to Feiner "from New York," and that Feiner "promise[d] to deliver releases . . . to [] Mirman in New York." (Pl.'s Opp'n at 7-8.)[7]

Feiner, on the other hand, takes a different view. He contends that his only role in the underlying settlement was as counsel to Comeau and Gayed. (Feiner Aff. ¶ 3.) Acting in this capacity, his responsibility was to "attempt to negotiate [a] settlement agreement with [Mirman] on behalf of Comeau and Gayed and to facilitate its completion." (Id.) He notes that he is a Connecticut domiciliary, (id. ¶ 17), is licensed to practice law

---

[7]Although these facts are advanced in plaintiff's memorandum of law rather than explicitly alleged in the Complaint, or established by affidavit, I have assumed their accuracy for purposes of determining defendant's Rule 12(b)(2) motion.

only in Connecticut, and is the member of a law firm located solely in Hartford, Connecticut, (id. ¶ 4), where Comeau and Gayed retained his services and where Feiner conducted all of the activity related to the underlying settlement, (id. ¶¶ 5, 7). None of the conduct at issue, Feiner argues, occurred in New York. (Def.'s Mem. at 3.)

III.    PERSONAL JURISDICTION

"New York law governs personal jurisdiction over nondomiciliaries in a diversity action brought in a [federal] district court sitting in New York." Guccione v. Harrah's Mktg. Servs. Corp., 2009 U.S. Dist. LEXIS 65388, *10 (S.D.N.Y. July 29, 2009)(internal quotation marks omitted); see also Fed. R. Civ. P. 4(k)(1)(A). "Under New York law, there are two bases for personal jurisdiction over out-of-state defendants: (1) general jurisdiction pursuant to N.Y. C.P.L.R. § 301, and (2) long-arm jurisdiction pursuant to N.Y. C.P.L.R. § 302." Blakeman v. The Walt Disney Co., 613 F. Supp. 2d 288, 301 (E.D.N.Y. 2009).

Plaintiff maintains that Feiner is subject to personal jurisdiction pursuant to two subsections of New York's long-arm statute: N.Y. CPLR §§ 302(a)(1) and 302(a)(3). (See Pl.'s Opp'n at 2, 7.) Those subsections provide for the "exercise [of] personal jurisdiction over any non-domiciliary . . . who in person or through an agent: (1) transacts any business within the state or contracts anywhere to supply goods or services in the

-7-

state; or . . . (3) commits a tortious act without the state causing injury to person or property within the state . . . ." N.Y. CPLR § 302(a).[8] The parties' positions are analyzed below within the context of these two subsections of New York's long-arm statute.

a.   Subsection 302(a)(1)

(i.) <u>Transaction of Business</u>

As noted above, subsection 302(a)(1) relates to a non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. CPLR § 302(a)(1). With regard to the transaction of business prong, subsection 302(a)(1) is a "single-act statute requiring but one transaction—albeit a purposeful transaction—to confer jurisdiction in New York." <u>Grand River Enters. Six Nations, Ltd. v. Pryor</u>, 425 F.3d 158, 166 (2d Cir. 2005)(internal quotation marks omitted).  It is also well established that a party need not be physically present in the state at the time of service in order for the court to obtain personal jurisdiction, "[s]o long as a party avails itself of the benefits of the forum, has sufficient minimum contacts with it, and should reasonably expect to defend its actions there." <u>Kreutter v. McFadden Oil Corp.</u>, 71 N.Y.2d 460, 466, 522 N.E.2d 40 (1988); <u>see also</u> <u>Deutsche Bank</u>

---

[8] Subsection (a)(3) contains further conditions discussed in more detail below.

Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 71, 850 N.E.2d
1140 (2006)("[T]he growth of national markets for commercial
trade, as well as technological advances in communication, enable
a party to transact enormous volumes of business within a state
without physically entering it."), cert denied 549 U.S. 1095
(2006).

      "Although it is impossible to precisely fix those acts
that constitute a transaction of business, [] precedents
establish that it is the quality of the defendants' New York
contacts that is the primary consideration." Fischbarg v.
Doucet, 9 N.Y.3d 375, 380, 880 N.E.2d 22 (2007) (motion to
dismiss)(citing, inter alia, Longines-Wittnauer Watch Co. v
Barnes & Reinecke, 15 N.Y.2d 443, 209 N.E.2d 68 (1965)). In that
pursuit, courts consider a number of factors to determine whether
a non-domiciliary, who was not physically present in the state,
has nevertheless transacted business under New York's long-arm
statute. Among these factors are (1) whether there was "the
purposeful creation of a continuing relationship" with the
plaintiff, Grimaldi v. Guinn, 72 A.D.3d 37, 44 (2d Dep't
2010)(citing Fischbarg, 9 N.Y.3d at 381); (2) whether the
defendant "on his own initiative . . . project[s] himself" into
New York to engage in a "sustained and substantial transaction of
business," Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d
13, 18, 256 N.E.2d 506 (1970)(motion to dismiss following a

hearing before a referee); and (3) whether the defendant "has purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999)(citation and internal quotation marks omitted); accord Ehrenfeld v. Bin Mahfouz, 9 N.Y.3d 501, 508, 881 N.E.2d 830 (2007). Additionally, "where there is a showing that business was transacted, there must be a 'substantial nexus' between the business and the cause of action." Grand River, 425 at 166 (quoting Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 59-60 (2d Cir. 1985)).

　　　　In the present case, Mirman alleges that Feiner agreed to act as his "escrow agent." Although Feiner takes issue with the label Mirman affixes to their relationship, see footnote 4 supra, and maintains that an additional 300,000 Charys shares were due under the settlement agreement, see footnote 3 supra, there is no dispute that Feiner agreed to accept some number of shares and a general release from Mirman and to hold these items for the parties in Connecticut until the settlement was consummated. (See Compl., Ex. B (Email dated July 2, 2007 from Feiner to Mirman, stating: ("I received the [] shares . . . . They are being held in escrow by me pursuant to the

-10-

agreement.").)[9]   It is also undisputed that Feiner never physically appeared in New York and never met plaintiff in person, but he did communicate from his office in Connecticut with Mirman in New York over phone, email, and fax.[10]

Mirman ultimately carries the burden to demonstrate that through these acts, and under the totality of the circumstances, Feiner transacted business in New York within the

---

[9] Defendant's affidavit states:

> The parties to the underlying transaction agreed that the consideration in contemplation of settlement[,] including the shares of Charys stock and the executed General Releases[,] would be held in "escrow" at Feiner Wolfson, LLC in Hartford, Connecticut. In fact, Plaintiff delivered 100,000 shares of Charys stock in satisfaction of the first term of the settlement to my office in Connecticut on or about July 2, 2007.

(Feiner Aff. ¶ 21.)

[10] A number of these communications were related to the settlement negotiations between Feiner and Mirman, and not necessarily to the subsequent agreement that Feiner would provide escrow services. (See, e.g., Compl. ¶ 10 ("In connection with the negotiations surrounding the Settlement . . . , Defendant conducted numerous one-on-one telephone discussions directly with Mr. Mirman.  Defendant also exchanged numerous email correspondence with Mr. Mirman further to the Settlement Negotiations.").  Mirman also alleges that Feiner transmitted "draft releases he had prepared for Plaintiff's execution in New York." (Pl.'s Opp'n at 7.)  Because some of these communications relate solely to Feiner's settlement negotiations and others to the agreement to provide the escrow services that give rise to plaintiff's claims, as articulated in his complaint (see, e.g., Compl. ¶¶ 3, 23, 29, 31, 38, 41, 45), only the latter will be considered by the Court in determining personal jurisdiction. See Grand River, 425 F.3d at 166 ("[W]here there is a showing that business was transacted, there must be a 'substantial nexus' between the business and the cause of action.")

purview of § 302(a)(1). In an effort to discharge that burden, Mirman relies primarily on two cases, to wit <u>Schur v. Porter</u>, 712 F. Supp. 1140 (S.D.N.Y. 1989), and <u>Catsimatidis v. Innovative Travel Group, Inc.</u>, 650 F. Supp. 748 (S.D.N.Y. 1986).

As to <u>Schur</u>, plaintiff maintains that

> [i]n an analogous case, . . . the Southern District Court of New York found that "[b]y letters and telephone calls into New York, [the defendant, an attorney in Washington D.C.] represented the plaintiffs in the negotiation and drafting of . . . agreements," and as such, "<u>[i]t is fair and reasonable for [defendant] to have expected to defend these services in a New York court</u>."

(Pl.'s Opp'n at 8 (emphasis in original).)

The full text of the paragraph from which the above quote is taken reads as follows:

> By letters and telephone calls into New York, Porter represented the plaintiffs in the negotiation and drafting of the Trio and the Schur Realty partnership agreements. <u>Both partnerships were formed in New York to own and operate New York properties, and were governed by New York law. Thus, Porter agreed to and did supply services in New York for a New York business transaction</u>. It is fair and reasonable for Porter to have expected to defend these services in a New York court.

<u>Schur</u>, 712 F. Supp. at 1145 (emphasis added, indicating portions of the cited paragraph deleted by Mirman).

Central to the holding in <u>Schur</u> was the fact that the agreements being drafted by the out-of-state defendant pertained

-12-

solely to New York properties which were to be "governed" by New York law, a situation so dissimilar to the de minimis contacts here as to render its holding essentially meaningless for present purposes.

In Catsimatidis, the district court held that plaintiffs had sufficiently alleged the transaction of business in New York to withstand defendant Toll's[11] Rule 12(b)(2) motion to dismiss.[12] That motion, like the one at bar, was made prior to discovery and, as a result, all factually supported allegations were construed most favorably to the nonmovant.

"Catsimatidis claim[ed] that Toll telephoned him several times in New York expressly to discuss the terms of what ultimately evolved into the agreement, that the [meeting held in New York] was the most important of the three successive negotiation sessions, that Toll personally agreed to guaranty his performance under the agreement at the New York meeting — which greatly influenced plaintiffs to enter into the agreement — that Catsimatidis' checks were drawn on a New York bank, and that

---

[11] The moving defendant Toll was a citizen of Pennsylvania, and the chief executive officer of non-party American Airways which was a Delaware corporation with its principal offices in Pennsylvania.

[12] The factual allegations in Catsimatidis regarding defendants' business transactions in New York were contained in plaintiffs' complaint, as well as in their affidavit submitted in opposition to defendants' Fed. R. Civ. P. 12(b)(2) motion to dismiss.

substantial performance was to occur in New York." Id. at 751-
52. Based on those assertions, the Rule 12(b)(2) motion in
Catsimatidis was denied. Here, in contrast, there are no factual
allegations to suggest, inter alia, that Feiner met with Mirman
in New York concerning the subject escrow agreement (or,
parenthetically, with respect to the underlying settlement
agreement), nor that substantial performance was to occur in New
York. Under the circumstances, Mirman's reliance on Catsimatidis
is misplaced.

Here, unlike in Schur and Catsimatidis, Mirman's
Complaint is devoid of factual allegations suggesting that Feiner
"purposefully avail[ed himself] of the privilege of conducting
activities within New York . . . thereby invoking the benefits
and protections of its laws." Licci v. Labanese Canadian Bank,
SAL, 673 F.3d 50, 61 (2d Cir. 2012)(internal quotation marks and
citations deleted). Simply put, neither case supports the
proposition that Feiner is subject to long arm jurisdiction as
having transacted business here within the meaning of § 302(a)(1)
as urged by plaintiff. Instead, reference to relevant case law
indicates just the opposite. For example, consider Bank
Brussels. There, the defendant, a law firm in Puerto Rico, was
solicited by the plaintiff's regional office in New York. The
Circuit noted that "all of [the defendant's] communications
involved either the negotiation of the original agreement for

-14-

legal services" or other input concerning the final work product. Bank Brussels, 171 F.3d at 788. "In none of those communications did [the defendant] . . . project itself into New York to participate in any activities localized in the state." Id.

Similarly instructive for present purposes is Executive Life Ltd. v Silverman, 68 A.D.3d 715, 716 (2d Dep't 2009), in which New York's Second Department found the New York's long-arm statute did not apply where the defendant, an attorney in Colorado, contracted with plaintiff, a "New-York based executive search agency," to find a paralegal for its staff. There, the parties negotiated a contract solely over the phone and executed the agreement by fax. Id. at 716. Working exclusively from New York, the plaintiff then found defendant a candidate who was based in Colorado. Id. at 717. The court concluded that, "under the totality of the circumstances," although there were negotiations with the plaintiff in New York by phone, and although the defendant faxed an executed copy of the agreement to plaintiff in New York, "the defendant's actions did not amount to a purposeful invocation of the privileges of conducting business in New York." Id. at 716, 717.

Here, Feiner did not perform any of his services in New York. He entered into an agreement with Mirman by correspondence from Connecticut, he received the shares and the releases from Mirman while in Connecticut, he held these materials in escrow

-15-

with his firm in Connecticut, and conducted all of the business related to this action while physically in Connecticut.

Furthermore, Feiner did not "project[] himself" into New York to engage in a "sustained and substantial transaction of business." Parke-Bernet, 26 N.Y.2d at 18. The agreement between the parties here merely contemplated Feiner holding Mirman's materials until the other parties completed their part in the settlement. Assuming the other parties follow through with those commitments, all that Feiner will be required to do vis-à-vis Mirman is mail him copies of the general releases. Although, the escrow relationship arguably still continues to this day,[13] this fact alone is not enough to confer personal jurisdiction. Rather, "[i]t is the quality of the defendants' New York contacts that is the primary consideration," Fischbarg, 9 N.Y.3d at 380, and the parties here have had meager involvement with each other over the course of their escrow relationship. In fact, Feiner's escrow responsibilities appear to have required no communication with Mirman, save for an initial email confirming that he had received the shares and release, and that they were both being held in escrow in Connecticut.

By way of contrast, i.e. in cases in which long-arm jurisdiction was found to exist, consider Fischbarg, cited

---

[13] Feiner's firm has confirmed that they are still holding the settlement items in escrow. (Compl. ¶ 21.)

earlier, in which California defendants actively sought the services of Gabriel Fischbarg, a New York attorney, to represent them in Oregon. The Fischbarg Court recognized personal jurisdiction under § 302(a)(1) given the following scenario:

> On May 30, 2001, Allegro filed suit against ONAM in the United States District Court for the District of Oregon. Although plaintiff was admitted to that court pro hac vice, during the course of the Oregon action, he was never physically present in Oregon. Nor did he ever meet with plaintiffs in California. Instead, plaintiff conducted his work pertaining to the Oregon action – allegedly 238.4 hours worth – from New York. He appeared at depositions and court conferences, and argued a motion for summary judgment via telephone from New York.
>
> In addition, defendants repeatedly communicated with plaintiff in New York. According to plaintiff, over the course of approximately nine months (May 2001 through January 2002) during his representation of ONAM in the Oregon action, he spoke with defendants by telephone at least twice per week regarding their case. Plaintiff's time records also show that on at least 31 occasions defendants sent e-mails regarding the Oregon case to plaintiff, that on three occasions they faxed materials to him, and that defendants sent plaintiff documents, by either mail or e-mail, seven times.

9 N.Y.3d at 378.

Given the pervasiveness and quality of defendants' contacts with New York and Fischbarg, the New York Court of Appeals found that they had "availed themselves of the benefits and protections of New York's laws governing lawyers" and thus, were subject to suit here. Id. at 385. Feiner, unlike the

-17-

defendants in Fischbarg did not "repeatedly project[] [himself] into New York" to advance his own interest. Id. Instead, he simply agreed to serve as an escrow agent for what typically would have been a simple, one-shot transaction.

In cases where courts have declined to extend long-arm jurisdiction, the defendant's level of involvement resembled the paucity of contacts present here. For example, in Etra v. Matta, 61 N.Y.2d 455, 463 N.E.2d 3 (1984), Henry Etra ("Etra"), was treated in Massachusetts by a Massachusetts physician, Bernard Lown ("Lown"). As part of that treatment, Lown provided Etra with a supply of an experimental drug to take back to his home in New York, coupled with a referral to a New York physician, Raymond Matta ("Matta"), for follow-up care. Lown also served as a consultant as to the drug regimen upon Etra's return to New York. In that capacity, Lown communicated with Matta several times by telephone and letter, and with Etra's wife by telephone. On one occasion, Etra returned to Massachusetts to personally confer with Lown. Additionally, Lown sent an additional supply of the subject drug to New York. Thereafter, Etra died in a New York hospital, purportedly as a result of his usage of the experimental drug.

The executors of Etra's estate sued the drug manufacturer and Matta. Matta, in turn, impleaded Lown. Lown then moved to dismiss the third-party complaint on the grounds

-18-

that his contacts with New York were insufficient to sustain long-arm jurisdiction.

In affirming the granting of that motion, the New York Court of Appeals held that in "[v]iewing the totality of Dr. Lown's contacts with this State, in the form of written and telephonic communications and the additional provision of the experimental drug, we believe them to be too insubstantial to amount to such a 'transaction of business' as to warrant subjecting Dr. Lown to suit in this forum." Id. at 458-59. The same conclusion is warranted here in that Feiner's contacts with New York are certainly no more substantial than Lown's.

The Court recognizes that Mirman's burden in seeking to repel Feiner's Rule 12(b)(2) motion is relatively modest at this stage of the proceeding. Nevertheless, having viewed the undisputed facts in the light most favorable to plaintiff, and having given plaintiff every benefit of the doubt, the Court concludes that the quality and nature of Feiner's New York contacts demonstrate that he did not transact business in New York under CPLR § 302(a)(1). Feiner clearly made contact with Mirman for purposes other than to project himself into the New York market. Moreover, to the extent that the parties' contacts amounted to a business relationship, at no time did Feiner avail himself of the privileges and benefits of conducting business in New York. The alleged facts therefore fail to evince the

-19-

existence personal jurisdiction under the first prong of subsection 302(a)(1).

(ii.) Contract to Supply Services in the State

The second prong of 302(a)(1) confers jurisdiction over a nondomiciliary who "contracts anywhere to supply goods or services in the state." As with the first prong, the defendant need not be physically present in the state to supply services in the state. See, e.g., Bank Brussels, 171 F.3d at 789; Liberatore v. Calvino, 293 A.D.2d 217, 220-22 (1st Dep't 2002). Nevertheless, a comparison to the facts in Bank Brussels militates against the exercise of jurisdiction under the second prong. There, the defendant law firm in Puerto Rico provided the plaintiffs in New York with a written opinion on the enforceability of Puerto Rican security interests offered as part of a revolving credit agreement ("RCA") that was to be executed in New York. The Circuit held that although the "opinion was a condition precedent to the closing of the RCA, and although this [RCA] transaction took place in New York and was governed by New York law," the defendant was not actually involved in the closing. Id. at 789. Indeed "[a]ll of the relevant services [performed by defendant] were . . . performed in Puerto Rico." Id. Defendant could not be said to have ever "projected itself into New York to perform services in the state" or "purposefully availed itself of the privileges and benefits of performing any

-20-

services in the state." Id. at 789.  Thus, the Second Circuit

concluded, the invocation of "§ 302(a)(1) jurisdiction is . . .

inappropriate." Id.

The same conclusion is called for in this case.  As

discussed in more detail above, none of Feiner's escrow services

were to be performed in New York; all were subject to performance

out of state.  Personal jurisdiction is therefore not authorized

under the second prong of 302(a)(1).

b.    Section 302(a)(3)

Plaintiff next argues that there is personal

jurisdiction under 302(a)(3), which permits personal jurisdiction

over a non-domiciliary who:

> (3) commits a tortious act without the state
> causing injury to person or property within
> the state . . . if he
>
>> (i) regularly does or solicits business,
>> or engages in any other persistent
>> course of conduct, or derives
>> substantial revenue from goods used or
>> consumed or services rendered, in the
>> state, or
>>
>> (ii) expects or should reasonably expect
>> the act to have consequences in the
>> state and derives substantial revenue
>> from interstate or international
>> commerce . . . ."

N.Y. CPLR § 302(a)(3).

To establish a prima facie showing of jurisdiction

under CPLR § 302(a)(3), Mirman must allege facts, which, if

ultimately found to be true, would establish that (1) Feiner

-21-

committed a tortious act outside of New York that serves as the basis for Mirman's claim; (2) the act caused injury to Mirman in New York; and (3) that Feiner's activities also satisfy the requirements of either subset (i) or subset (ii) of the statute. See Merck Eprova AG v. Gnosis S.P.A., 2008 U.S. Dist. LEXIS 104712, *8 (S.D.N.Y. Dec. 12, 2008).

"Courts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the original event which caused the injury." Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 209 (2d Cir. 2001)(internal citation and quotation marks deleted). "The situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff." Id. (internal alteration and quotation marks deleted). "This 'original event' is, however, generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of that tort." Bank Brussels, 171 F.3d at 791.

For an example of the pivotal role the "situs of injury" principle may have on the outcome of a case, consider the rationale underlying the holding in Whitaker. Whitaker, a New York resident, claimed that he was retained by Fresno Telsat, Inc. ("FTI"), in its California action against an FTI partner and

-22-

American Telecasting, Inc. ("ATI"), for breach of a fiduciary duty. During the trial of that action but prior to judgment, FTI retained another attorney for the purpose of negotiating a possible settlement with ATI. That attorney did so but, according to Whitaker, the resulting settlement agreement "unfairly deprived him of legal fees in breach of his [retainer] agreement with FTI." 261 F.3d at 199.

After asserting a statutory charging lien under the New York Judiciary Law against both his client and ATI, Whitaker sued in the Supreme Court, New York County to recover the monies claimed to be due. That action was removed to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1441(a), with federal jurisdiction being based on diversity of citizenship.

ATI successfully moved in the district court under Rule 12(b)(2) to dismiss on the ground that it was not subject to in personam jurisdiction under § 302(a)(3). On appeal, Whitaker maintained "that ATI committed tortious conduct outside of New York through conspiring with FTI to deprive him of legal fees, with the intent to economically injure him in New York. Further, he assert[ed] that the original event giving rise to his claim of economic harm [i.e. the "situs of injury"] was his tendering of legal service to FTI in New York." Id. at 209.

The Circuit, after accepting plaintiff's factual

-23-

assertions, as distinct from legal conclusions, as true, found those assertions insufficient "to serve as the basis for injury in New York and hence, jurisdiction under § 302(a)(3)." Id. In so concluding, the Court explained that the "alleged injury . . . does not arise out of the legal services provided, but out of ATI's alleged failure to pay for such services." Id. "[T]he relevant, original event which caused the alleged injury was 'either the structuring of the partnership sale to avoid payment [to Whitaker] or the actual withholding of payment to Whitaker, both of which occurred outside New York.'" Id. (quoting Whitaker v. Fresno Telsat, Inc., 87 F.Supp.2d 227, 233 (S.D.N.Y. 1999)).

        In determining the situs of the injury, it is therefore important to identify the original events that purportedly caused Mirman harm, and then determine where those events took place. Here, Mirman alleges that he was harmed in two alternate ways as a result of Feiner's refusal to timely release the materials from escrow depending on whether the settlement underlying the escrow agreement was actually consummated: (1) had Feiner returned the Charys stock within a reasonable time, Mirman could have sold the shares for value before the company went into bankruptcy and the stock was rendered worthless (hereinafter, the "first injury"); or (2) had Feiner timely returned the signed releases from Comeau and Gayed, he would not have had to incur the legal expenses arising out of the Florida lawsuit (hereinafter the "second

-24-

injury"). (Compl. ¶¶ 45-46.)

With regard to the first injury, one may argue that the "original event" alleged to have affected Mirman was Feiner's failure to timely return Mirman's shares in Charys. However, this event is more accurately characterized as the tort itself, as distinct from the original event. Alternatively, one could view the original event to be the filing for bankruptcy by Charys, wherein the Charys stock held in escrow by Feiner (allegedly worth $178,000 at the time of delivery) became worthless. (See Compl. ¶ 18.) In neither case, however, did the original event occur in New York. Although Mirman may have eventually felt the effect of this event in the state, Feiner's retention of the stock occurred in Connecticut, and the bankruptcy proceedings occurred in Delaware.[14] The situs of Mirman's first injury is therefore either Connecticut or

_____

[14] Public records reflect that the Charys company filed bankruptcy in the United States Bankruptcy Court for the District of Delaware on February 14, 2008 – the month and year indicated by plaintiff in the Complaint. See In Re Charms Holding Company, Inc., Case No. 08-10289 (BLS) (Bankr. D. Del.). Neither party provided the location of the bankruptcy in their papers. Nevertheless, in deciding a motion to dismiss, the Court may take judicial notice of court documents not attached to the pleadings without converting the motion to one for summary judgment. See Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006)("A Court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.")(internal quotation marks omitted); see also Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public records of which the court could take judicial notice.").

Delaware, but not New York.

As to the second injury, the relevant triggering event is either Feiner's failure to send the executed mutual releases to Mirman, or the commencement of the Florida lawsuit. The former—also fairly characterized as the tort itself—occurred in Connecticut; the latter took place in Florida. The second situs of injury was therefore either in Connecticut or Florida, not New York. Thus, as the alleged tort did not "caus[e] injury to person or property within the state," as that term is understood under CPLR § 302(a)(3), the exercise of personal jurisdiction under that subsection is not permitted.[15]

---

[15]    In rejecting plaintiff's argument based on § 302(a)(3), consideration was given to <u>Polish v. Threshold Tech. Inc.</u>, 72 Misc. 2d 610, 340 N.Y.S. 2d 354 (Sup. Ct. 1972) upon which Mirman places considerable stock. Indeed, he describes it as an "analogous case." (Pl.'s Opp'n at 9.) However, the excerpts from the holding in <u>Polish</u> quoted by plaintiff, (<u>id.</u> at 9-10), were predicated on § 302(a)(2), not on § 302(a)(3). <u>Polish</u>, 72 Misc. 2d at 612. And, as noted in the text, plaintiff's <u>in personam</u> jurisdictional argument is premised solely on subdivisions (a)(1) and (a)(3) of § 302, absent reliance on subdivision (a)(2). (<u>See, e.g.,</u> Pl.'s Opp'n at 2, 7.) Moreover, the § 302(a)(2)-based conclusion in <u>Polish</u> is itself problematic. <u>See Glucoft v. Northside Sav. Bank</u>, 86 Misc. 2d 1007, 1009, 382 N.Y. Supp. 2d 690 (N.Y. Civ. Ct. 1976)(declining to follow <u>Polish</u> given the New York Court of Appeal's decision in <u>Kramer v. Vogl</u>, 17 N.Y.2d 27, 215 N.E.2d 159 (1966)); <u>see also</u> <u>Pramer, S.C.A. v. Abaplus Int'l Corp.</u>, 76 A.D.3d 89 (1st Dep't 2010) and <u>Bank Brussels</u>, 171 F.3d at 789-90. In both <u>Pramer</u> and <u>Bank Brussels</u>, the appellate courts explained that, for Section 302(a)(2) jurisdictional purposes, a defendant's wrongful conduct must occur in New York, a conclusion diametrically at odds with the holding in <u>Polish</u> that the defendant's out-of-state fraudulent statement which was relied upon by the plaintiff in New York falls within the ambit of Section 302(a)(2).

-26-

## CONCLUSION

Because plaintiff has failed to demonstrate personal jurisdiction over defendant under either of the long-arm provisions cited by plaintiff, viz., sections 302(a)(1) or 302(a)(3) of the CPLR, defendant's Fed. R. Civ. P. 12(b)(2) motion is granted. The Court will therefore not address defendant's alternate grounds for dismissal under Fed. R. Civ. P. 12(b)(3) and 12(b)(6).

Although plaintiff did not request leave to amend his Complaint in the event defendant's motion was granted, plaintiff will be given one limited opportunity to do so. To the extent plaintiff has a good faith basis to plead additional facts that would cure the deficiencies noted herein, he shall file a premotion conference letter requesting leave to move to amend the Complaint. Such premotion conference letter shall specify the additional facts that would be pled and shall be filed within thirty days of the date of this Order. If plaintiff does not file such a letter within that time frame, his opportunity to request leave to move to amend shall be deemed waived and the case will be marked closed.

SO ORDERED.

Dated:    Central Islip, N.Y.
          September 28, 2012

_____/S/_____
Denis R. Hurley
United States District Judge
